**Andrew ANDERSON**

v.

**EXXON CAR CARE CENTER, A DIVISION OF EXXON CORPORATION.**

Civ. A. No. 81–1895.

United States District Court, E. D. Louisiana.

Aug. 12, 1982.

---

R. Ray Orrill, Jr., New Orleans, La., for plaintiff.

Wm. J. Sommers, Jr., New Orleans, La., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEER, District Judge.

To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are so adopted.

### Findings of Fact

1. At all times relevant to this action, plaintiff Andrew Anderson, Jr. was a Louisiana citizen.

2. Defendant Exxon Corporation is and was a New Jersey corporation with its principal place of business in New York.

3. On April 7, 1980, plaintiff Anderson brought his 1976 Ford Thunderbird to the Exxon Car Care Center located at 3725 South Carrollton Avenue, New Orleans, Louisiana, in response to an advertisement for certain maintenance service work being offered at a special low cost at that time. Although the car was in good operating condition and displayed no problems at the time, Anderson regularly brought in his car for such maintenance work. After performing the maintenance work on the car for which Anderson paid $60, an Exxon attendant told Anderson that the car needed some work on the front end. Agreeing that such work should be performed, Anderson returned the car to the Exxon Car Care Center on April 9th. The work order and invoice prepared by Exxon indicated that Exxon replaced the car's lower ball joints and idler arm, and aligned the front end. Anderson paid $168 for the work allegedly performed during this second episode.

4. Shortly thereafter, Anderson encountered, for the first time, difficulty in properly steering the car. Specifically, when Anderson turned the steering wheel slightly to the left or right, the car turned too much in that direction. Anderson also noted that the car's front end abnormally vibrated or "shimmied" when driven. To have the problems corrected, Anderson returned to the Exxon Car Care Center, then for a third time. At this time, Anderson was told that the problem may have been related to the condition of the car's tires, and, therefore, Anderson purchased new tires and had the wheels balanced at a further cost of $119.68.

5. Anderson still noticed that the car was "oversteering" and that it wasn't balanced properly. Thus, Anderson returned with the car for the fourth time to the Exxon Car Care Center. After Exxon examined the car, Anderson drove the car to his evening job as a bail bondsman. Anderson noticed that the car still oversteered.

6. As Anderson was driving home from work on April 11, he headed into a left-hand curve at the on-ramp to Interstate Highway 610 at about 40 miles per hour. As Anderson attempted to negotiate the curve by turning the wheel to the left, the car veered too far to the left. Anderson then tried to correct the situation by turning the wheel to the right but the car went too far right and hit the interstate railing. The car then bounced back and struck the opposite railing, at which time the car came to a complete stop.

7. The impact caused Anderson to fall to the floor of his car. He could not open the door on the driver's side of the car and thus exited through the passenger's door and sat down on the ground. A tow truck was called to remove the car.

8. Anderson sustained relatively minor injuries. He visited Dr. Joseph Labat three days after the accident and complained of discomfort in his neck, chest and back. One week after the accident, Anderson visited Dr. Bert Bratton, a neurosurgeon, and complained of lower back stiffness, as well as neck and chest pain. Dr. Bratton took x-

rays of Anderson's back and chest and prescribed a pain reliever and a muscle relaxer. By the following week when Anderson returned to Dr. Bratton, Anderson still felt some soreness but felt generally improved. Dr. Bratton advised Anderson to continue the medication as needed and told Anderson that he could return to work.

9. Approximately three months after the accident, Anderson visited Dr. Nelville Reehlmann, an orthopedic surgeon, and complained about pain in his knee. Dr. Reehlmann diagnosed the injury as "dashboard knee," i.e., an injury resulting from a blunt trauma to the knee. To relieve the pain which hindered Anderson from climbing steps or walking with ease, Dr. Reehlmann prescribed an anti-inflammatory medication. After a second visit, Dr. Reehlmann concluded from x-rays that Anderson's knee sustained traumatic aggravation with an underlying degenerative joint problem.

10. Anderson's medical bills for the cost of the office visits and x-rays described above totalled $514.

11. As a result of the accident, Anderson missed little or no time from his regular work, but claims some inability to perform his work as a bail bondsman for several weeks. Anderson's compensation from this evening employment was based entirely upon a commission of 5% of the amount of the bonds in question so that earnings (if any) cannot be measured in an exact dollar amount although I conclude that there is some consideration to be given to this aspect of the claim.

12. Within a week after the accident, Julius Martin, the owner of R & M Body Repair & Frame Center, Inc., appraised the damage to Anderson's car. Martin found that the estimated cost of repairing the car exceeded its fair market value of $4,325, and considered the car a total loss.

13. Andrew J. McPhate, called by plaintiff at trial as an expert in mechanical engineering with expertise in automobile structure, testified that his examination of the car wreckage revealed that although the car's idler arm appeared to have been recently replaced, the two lower ball joints could not have been. McPhate based his conclusion upon the undisturbed layers of dirt which had accumulated over the lower ball joint areas. And due to the presence of numerous indentations, McPhate further concluded that an attempt apparently had been made to align the car, not by inserting new ball joints, which would have fit tightly, but, rather, by hammering or pounding the metal around the existing ball joints. This latter method would have aligned the car only temporarily until a jolt or other sudden motion would have caused disalignment. McPhate, however, could not conclude that the failure to replace the ball joints caused the oversteering problem which resulted in Anderson's accident. A number of other problems, such as malfunction of power steering, worn out shock absorbers combined with old tires, defective steering linkage or lower control arm bushings, individually or collectively could have been the cause of the oversteering Anderson encountered.

14. McPhate stated that insofar as these other possible sources of steering difficulty are all components of the car's front end system, a proper front end alignment would necessarily entail an inspection of this entire integrated system.

15. Robert Young, the Exxon mechanic who worked on Anderson's car, testified that although he could not specifically remember changing the parts in Anderson's car, he always used a hammer to install new ball joints, not to tighten ball joints.

16. James Martin, the Exxon service manager who worked with Young on Anderson's car, testified that loose ball joints would not cause the oversteering problem Anderson encountered. Loose ball joints might cause the car to vibrate when driven at 40 to 50 miles per hour. Martin further testified that he and Young got under Anderson's car to determine what work needed to be performed to correct the oversteering of which Anderson complained. Martin was the person who decided that the front end system should be inspected and aligned.

17. Harold Pilie, Jr., defendant's expert in automotive engineering, testified that hammering is an acceptable way of inserting a new ball joint, but later admitted during cross-examination that a small tool known as a ball joint press set is available to mechanics at a relatively low cost. Pilie testified that hammering would be an impractical way of trying to tighten ball joints because to do so would require an inordinate amount of time and would prevent the joints from functioning properly.

18. The court's examination of the car parts introduced by plaintiff at trial revealed two lower ball joints, one of which was looser than the other. Neither appeared to have been replaced recently.

19. The failure of Exxon to replace the ball joints, as had been indicated on the work order and for which Anderson paid, does not translate into an actual cause of the oversteering problem which resulted in Anderson's accident. At most, the possible failure to replace the ball joints may have contributed to the cause of the car vibrating when driven above 40 miles per hour. However, Exxon's failure to replace the lower control arm ball joints as indicated does undermine the presumption of regularity which might otherwise be ascribed to the front end suspension work Exxon also was to perform on Anderson's car. And, since the front end system housed all the likely sources of Anderson's oversteering problem, it is more likely than not that the specific cause of Anderson's oversteering problem (and the resulting accident) which would have been detected during a reasonably thorough front end alignment, was either overlooked by the Exxon employees or was left uncorrected even if observed.

20. Anderson testified that his car was the only car involved in the accident. The only contradictory evidence was Dr. Bratton's testimony concerning a medical report in which Bratton noted that Anderson stated that he swerved to avoid hitting another car. Dr. Bratton had no independent recollection of such a statement by Anderson during his medical examination. This evidence is an insufficient basis upon which to reject Anderson's contention.

*Conclusions of Law*

1. This court has jurisdiction over this matter under 28 U.S.C. §§ 1332 and 1441.

2. Plaintiff Anderson brought this suit against Exxon contending that the automobile accident and resulting damages were caused by the negligent failure of defendant's agents and employees to properly and adequately check and perform maintenance and repairs to Anderson's car. Defendant Exxon contends that it was not negligent nor in any way responsible for plaintiff's alleged injuries. Exxon further contends that the alleged accident occurred, if at all, under circumstances over which it had neither control nor supervision. Exxon finally contends that any injuries suffered by plaintiff resulted from plaintiff's own contributory negligence so as to bar all claims herein presented.

3. The findings of fact outlined above support plaintiff's contentions that Exxon failed to perform, in a reasonably proper and adequate manner, the maintenance and repair work it had undertaken to perform. Although Exxon's apparent failure to replace the two lower control arm ball joints and Exxon's apparent failure to properly inspect and align the component parts of the front end system are not necessarily related, I nevertheless conclude that by these showings plaintiff has convinced me that the front end problems which resulted in Anderson's oversteering difficulties, more likely than not, could have been discovered and, accordingly, corrected during a reasonably thorough front end inspection and alignment.

4. When a mechanic contracts to repair a defect in an automobile, he does not impliedly contract to inspect and repair the neighboring parts. *Glisson v. Colonial Buick*, 156 So.2d 271, 274 (La.App. 4th Cir. 1963). However, this principle is not applicable to the circumstances here. Exxon did not contract simply to replace the lower ball joints. Rather, Exxon further contracted to align the car's front end and later to mount and spin balance the car's two new tires. Thus, Exxon assumed inspection and

repair responsibility for the good working condition of these areas, and I am forced to the conclusion that, based on other indications of impropriety, they did not carry out their responsibilities in connection with this critical aspect of the present case.

5. The facts do not support Exxon's contention that plaintiff was negligent and thereby contributed to or caused his own accident. Plaintiff acted reasonably by bringing and returning the car to the Exxon Car Care Center to correct the oversteering and shimmying problems he encountered. And, at the time of the accident, Anderson was driving at a reasonable rate of speed and reacted to the car's oversteering in a reasonable manner by attempting to negotiate the curve in the road.

6. Defendant Exxon Corporation is liable for the damages sustained by plaintiff which were proximately caused by the negligent acts of Exxon's agents and employees. Specifically, plaintiff has proven the following damages: the fair market value of his car, $4,325; medical expenses, $514; and general damages for his pain, inconvenience and lost earnings in the amount of $1,750.

Plaintiff is instructed to prepare and submit a judgment in favor of plaintiff and against defendant in the amount of $6,589, plus costs, and interest from the date of judgment.